Mudher Jassim Mohamed AL–
SAHER, Petitioner,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

No. 99–71308.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 9, 2001

Filed Oct. 23, 2001

**1144**

Thankful T. Vanderstar and Nancy E. Friedman, U.S. Department of Justice, Washington, D.C., for the respondent.

Before: HUG, and B. FLETCHER, Circuit Judges, and KING, District Judge.*

HUG, Circuit Judge:

Mudher Jassim Mohamed Al–Saher, a native and citizen of Iraq, petitions for review of the Board of Immigration Appeals' ("BIA") dismissal of his appeal from the Immigration Judge's ("IJ") denial of his application for asylum and withholding of removal and for protection under the Convention against Torture. We have jurisdiction pursuant to 8 U.S.C. § 1252(b).

### Facts and Procedure

Al–Saher arrived at Los Angeles International Airport seeking admission to the United States as a non-immigrant visitor. He presented no valid entry document and the INS issued a Notice to Appear (NTA) charging him with removability as an immigrant not in possession of a valid travel or entry document.

At his hearing he presented the following testimony. He was in the Iraqi military from 1984 until 1992 and thereafter until he left Iraq he was a civilian government worker assigned to work with the military. When he initially applied for military service in 1984 he claimed to be a Sunni Muslim from Baghdad even though he was a Shiite Muslim from Al-Bashra. He stated he misrepresented his religion and place of birth because there was dis-

J. Jack Artz, Pasadena, California, for the petitioner.

---

\* Honorable Samuel P. King, Senior United States District Judge for the District of Ha- waii, sitting by designation.

crimination against Shiite Muslims. In 1997, the truth was revealed when his father completed a census form stating that his family was Shiite.

Al–Saher was arrested in 1997 for misrepresenting his religion and place of birth. He was detained, interrogated and beaten for one month. He described the type of beatings he received stating that two people came in, blindfolded him, tied his hands behind his back,

> and the only thing I felt was getting beaten up. They just kept beating me up.... I came to a point that I could not stand on my feet—on my legs anymore ... so I went flat on the floor. I tried to protect my face and my stomach from the beating until they had enough of torturing me.... They told me don't say nothing. Just get beaten and keep quiet.... Every little while someone came by for me and take me. I felt like a ball and they were just having fun. It kept on this way somewhere between 10 days to 2 weeks.

He explained that at that time his father was trying to get in contact with high authority so that he would not be beaten up. He stated that he stayed two weeks after the first period of beatings. During that time every three or four days an officer would come in at night and beat him up until his father paid a half million dinar to someone in the office of Saddam Hussein. As he left they told him that he was to tell no one about his experience, stating "if we ever heard anything that you have talked, you're going to come back and do the same thing again. Same room will be reserved for you." When asked at the hearing what he was being beaten with he stated it was with their hands and feet and a thick electrical cable.

He went back to work on his job and in December he was instructed to take a number of men to construct a fence that was to be built in a sensitive location,

somewhere near the president. When he asked exactly where the fence was to be built, he was arrested. He stated that this time the beating was more severe and "had lots of monstrosities in it." He was again blindfolded with his hands tied behind him and beaten like before. This time they burned him with cigarettes. His parents got ahold of a friend who got him out after 8 to 10 days.

In April 1998 he was arrested again after he was heard talking with friends about how the elite Iraqi eat well while the poor go hungry. He and his friends were detained for 5 or 6 days until they escaped. He stated he found out it was not going to be the last time because anyone who has been accused and suspected twice that's going to be it for him—"it's impossible to let him go."

### *Asylum*

 We review for substantial evidence the BIA's determination that Al–Saher was not eligible for asylum. *Sebastian–Sebastian v. INS*, 195 F.3d 504, 506 (9th Cir.1999). To prevail, Al–Saher must show that the evidence not only supports, but compels the conclusion that the BIA was incorrect. *Id.*

 The BIA accepted Al–Saher's testimony as credible but concluded that he failed to meet his burden of proving that the reason he was persecuted was based on one of the five protected grounds. On appeal, Al–Saher concedes that although he received severe beatings and cigarette burns during his first two detentions, these arrests cannot be assigned to one of the five protected categories, race, religion, nationality, membership in a particular social group, or political opinion. He contends, however, that his third arrest was on account of a political opinion imputed to him by the Iraqi government.

■ It is clear that Al–Saher's statements regarding the unfair distribution of food in Iraq resulted in Iraqi officials imputing an anti-government political opinion to Al–Saher. A report drafted by officials which stated that Al–Saher was "against the government" supports this conclusion. Yet, while we believe that Iraqi officials imputed a political opinion to Al–Saher, Al–Saher was not persecuted on account of the imputed political opinion. "[P]ersecution is an extreme concept that does not include every sort of treatment our society regards as offensive." *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir.1995). Al–Saher testified that following his third arrest he was detained for a period of five or six days. However, he also stated that he was not beaten, tortured, or threatened prior to his escape from the third detention. While we do not know if Al–Saher would have been beaten if he had remained in custody, nothing that occurred prior to his escape from the third detention rises to the level of persecution. Thus, the record does not compel the conclusion that the BIA erred in finding that Al–Saher failed to establish past persecution as a result of his political opinion.

■ Substantial evidence also supports the BIA's determination that Al–Saher failed to prove a well-founded fear of future persecution. A well-founded fear of future persecution must be based on "race, religion, nationality, membership in a particular social group, or political opinion." *See Chanchavac v. INS*, 207 F.3d 584, 589 (9th Cir.2000). Al–Saher's first arrest resulted because he misrepresented his religion to the military and the second arrest involved a security concern. These arrests fail to establish that Al–Saher has a well-founded fear of persecution on account of an enumerated ground. As previously discussed, the treatment during his third detention did not establish persecution. Thus, the record does not compel a conclusion that the BIA erred in denying asylum based on a well-founded fear of future persecution on account of one of the five statutory grounds.

■ Because Al–Saher failed to establish his eligibility for asylum, he necessarily failed to establish a claim for withholding of deportation. *See Ghaly*, 58 F.3d at 1429.

### Convention Against Torture

Al–Saher also seeks relief from deportation under Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention Against Torture" or "Convention").

> The Foreign Affairs Reform and Restructuring Act of 1998 ("Foreign Affairs Reform Act"), § 2242, Pub.L. No. 105–277, Div. G, 112 Stat. 2681, 2681–761 (Oct. 21, 1998), implemented Article 3 of the Torture Convention in the United States. Article 3 provides that a signatory nation will not "expel, return ... or extradite" a person to another country "where there are substantial grounds for believing that he would be in danger of being subjected to torture." *Id.*

*Khourassany v. INS*, 208 F.3d 1096, 1099 (9th Cir.2000).

■ He contends that the sustained beatings and cigarette burns he received following his first two arrests constitute torture as defined under the Convention and implementing regulations. The regulations provide for a definition of torture:

> "Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or

coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *See* 8 C.F.R. § 208.18(a)(1) (2000). "Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture." 8 C.F.R. § 208.18(a)(2). "Torture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions," 8 C.F.R. § 208.18(a)(3).

The burden of proof is on the applicant "to establish that it is more likely than not that he ... would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). The petitioner, however, need not show that the torture was on account of a protected ground. *See* 8 C.F.R. § 208.16(c)(2); *Kamalthas v. INS*, 251 F.3d 1279, 1282–82 (9th Cir. 2001).

■ The BIA addressed Al–Saher's torture claim and concluded that the arrests did not amount to torture as defined in the regulations. Accepting Al–Saher's testimony as true, we must disagree. Al–Saher testified that he was subjected to sustained beatings for a month on the first arrest. On the second arrest he suffered severe beatings and was burned with cigarettes over an 8 to 10 day period. These are not practices "inherent in or incidental to lawful sanction." These actions were specifically intended by officials to inflict severe physical pain on Al–Saher.

■ The Country Reports on Human Rights and Practices for 1997 for Iraq tell of the torture routinely administered to those detained or imprisoned.

*c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment.*

The Constitution prohibits torture, however, the security services routinely tortured detainees. According to former detainees, torture techniques included branding, electric shocks administered to the genitals and other areas, beating, burning with hot irons, suspension from rotating ceiling fans, dripping acid on the skin, rape, breaking of limbs, denial of food and water, and threats to rape or otherwise harm relatives. The security forces killed many of their torture victims and mutilated their bodies before returning them to the victims' families. There are persistent reports that the families are made to pay for the costs of the execution, before the bodies are returned to them. Iraqi refugees arriving in Europe often reported instances of torture to the receiving governments and—as was the case with a group of refugees arriving in Italy in June—displayed scars and mutilations to substantiate their claims.

The BIA must take this into consideration when assessing whether an applicant qualifies under the Convention. *Cf. Al–Harbi v. INS*, 242 F.3d 882 (9th Cir.2001) (holding that Iraqi petitioner who failed to establish past persecution nonetheless had a well-founded fear of future persecution because evidence of country conditions supported the conclusion that the Iraqi government would persecute as traitors any evacuees who returned to Iraq). Al–Saher was informed that if he told anyone about the beatings he would be arrested again and suffer the same consequences.

When officials detained Al–Saher for the third time based on an imputed political opinion, Al–Saher managed to escape from custody and avoid the possibility of further severe beatings and physical abuse. He

then fled the country. If forced to return to Iraq, it is likely that Al–Saher would be tortured again. The Iraqi officials would correctly assume he has told of the beatings in making his claims in this proceeding. Based on these facts, we find that Al–Saher is entitled to withholding of removal under the Convention Against Torture. We grant Al–Saher's petition for review and remand to the BIA for entry of an order granting withholding of removal.

Petition for review GRANTED and case REMANDED.