**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FRANCISCO ORNELAS-CHAVEZ,
                        *Petitioner,*

                v.

ALBERTO R. GONZALES, Attorney
General,

                        *Respondent.*

No. 04-72798

Agency No.
A96-106-917

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
December 7, 2005—Portland, Oregon

Filed August 21, 2006

Before: James R. Browning, Dorothy W. Nelson, and
Diarmuid F. O'Scannlain, Circuit Judges.

Opinion by Judge Browning;
Dissent by Judge O'Scannlain

**COUNSEL**

Elizabeth B. Wydra, Washington, DC, for the petitioner.

Carol Federighi, U.S. Department of Justice, Washington, DC, for the respondent.

## OPINION

BROWNING, Senior Circuit Judge:

Francisco Ornelas-Chavez timely petitions this court for review of a Board of Immigration Appeals ("BIA") final order affirming the Immigration Judge's ("IJ") denial of his application for withholding of removal under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), 8 U.S.C. § 1231(b)(3), and the United Nations Convention Against Torture ("CAT").[1] He also appeals the BIA's denial of his due process challenge to the proceedings before the IJ. Ornelas-Chavez claims (1) the BIA erroneously required that he must have reported third-party persecution to government authorities to qualify for withholding of removal under section 1231(b)(3); (2) the BIA erred in denying protection under CAT by affirming the IJ's decision requiring that the alleged torture occur within the control or custody of a state actor who "sanctioned" it; and (3) the IJ's stereotyping of the way gay men dress and behave prevented him from receiving a fair hearing in violation of his due process rights.

We have jurisdiction under 8 U.S.C. § 1252(a). We conclude the BIA applied the wrong legal standards to Ornelas-Chavez's claims for withholding of removal under IIRIRA and CAT; therefore, we grant his petition with respect to those claims. Because we remand to the BIA for application of the correct standards, we do not reach his due process claim.

---

[1]Article 3 of CAT, implemented by the Foreign Affairs Reform and Restructuring Act of 1998, § 2242, Pub. L. No. 105-277, Div. G, 112 Stat. 2681, 2681-761 (Oct. 21, 1998), provides that a signatory nation will not "expel, return[,] or extradite" an alien to another country "where there are substantial grounds for believing that he would be in danger of being subjected to torture." *See Khourassany v. INS*, 208 F.3d 1096, 1099 (9th Cir. 2000).

I.

Ornelas-Chavez is a Mexican national who came to the United States illegally in 1998 to escape a lifetime of abuse suffered on account of his female sexual identity.[2]

Ornelas-Chavez suffered a great deal of abuse in his youth because of his homosexuality and female sexual identity. As a young boy, his mother beat him for dressing in her clothes. On several occasions, his father became so enraged at discovering evidence of his homosexuality that he beat Ornelas-Chavez savagely enough to leave noticeable injuries. Once, his father conspired with a friend to humiliate Ornelas-Chavez by permitting the friend to rape the boy after drugging him. When Ornelas-Chavez was six, two cousins raped him after seeing him dressed in women's clothes and playing with dolls. The cousins repeated this abuse until Ornelas-Chavez was twelve years old. A worker on his grandfather's hacienda who witnessed the cousins' abuse also raped him several times between the ages of seven and nine. Ultimately, Ornelas-Chavez fled his parents' home and lived in hiding from most of his family.

From his childhood through his adulthood in Mexico, Ornelas-Chavez's dealings with government officials and employees was marked by either animus toward his female sexual identity or tacit acceptance of the abuse he received because of it. After he reported to his second-grade teacher that his mother beat him for putting on her clothes, the teacher told him only "fags" dressed up in women's clothes. When he told the teacher that he had performed sexual intercourse with older men, she told him he "shouldn't do that because only homosexuals did that." The teacher never reported the sexual

---

[2]Because the IJ found Ornelas-Chavez's testimony credible and the BIA did not make a contrary finding, we accept the facts given by Ornelas-Chavez and all reasonable inferences to be drawn from them as true. *See Zheng v. Ashcroft*, 332 F.3d 1186, 1189 n.4 (9th Cir. 2003).

abuse to the proper authorities. When Ornelas-Chavez was sixteen, his father arranged to have the local police chief arrest and detain him for six hours to "teach [him] to behave." (The father was apparently on close terms with the local police, even renting a home to some of the officers.) Upon releasing Ornelas-Chavez, the police chief threatened to detain him longer if he found out again he was sexually involved with men. In 1989 Ornelas-Chavez took a job as a correctional officer at a state-run prison in Uruapan. Co-workers there repeatedly threatened and beat him, telling him that homosexuals discredited the work. Three times Ornelas-Chavez complained to his supervisor who, instead of disciplining the co-workers, encouraged him to quit, saying the job was "for men and not for homosexuals." Ornelas-Chavez did quit but, two years later, returned because he thought conditions had improved. Soon after returning, however, four or five of his co-workers tried to smother him with a pillow, boasting they were "finally going to get rid of another homo." When he reported this incident to his new supervisor, the man offered Ornelas-Chavez the choice of changing his shift or quitting but, again, took no action against the co-workers. Finally, while Ornelas-Chavez was living in Uruapan, the police killed two of his acquaintances who were homosexuals. The men were found stabbed to death with sticks inserted in their rectums.

In 1993, Ornelas-Chavez went to live with a sympathetic aunt in Mexicali. Though occasionally taunted in the streets, Ornelas-Chavez was able to live there relatively free of trouble for five years because he only went to work, otherwise staying inside his aunt's house. Then, in 1998, his father, who had discovered his whereabouts, came to Mexicali and beat him severely, breaking his nose with a bottle. Soon after, Ornelas-Chavez left Mexico for the United States.

In July 2003, United States Immigration and Customs Enforcement began removal proceedings against him. Ornelas-Chavez then filed an application for asylum and with-

holding of removal on the basis of a well-founded fear of persecution and torture on account of his female sexual identity.

At his removal hearing, the IJ held that Ornelas-Chavez was ineligible for asylum because he failed to show exceptional circumstances for filing his application later than one year after entering the United States. The IJ also found Ornelas-Chavez failed to establish eligibility for withholding of removal under IIRIRA and that he "provided no evidence of past torture or any mental or physical intentionally inflicted severe pain or suffering that is sanctioned by a public official or by a State Actor." Accordingly, the IJ denied the petition for withholding of removal.

Ornelas-Chavez appealed the IJ's withholding of removal decisions to the BIA. He also claimed that the IJ's hostile comments and stereotypes about the way a gay man should appear and sound prevented him from receiving a fair hearing. In affirming the IJ's section 1231(b)(3) decision, the BIA found that Ornelas-Chavez

> suffered one incident of harm, a detention of several hours apparently at [the] request of his father, at the hands of government agents. This single incident does not rise to the level of persecution. All of the other harm suffered by the respondent occurred at the hands of private citizens. The respondent did not report any of these incidents to government authorities.

The BIA also found that some of Ornelas-Chavez's extensive documentation on the conditions of gay men in Mexico described only general police abuse, not necessarily against gay people, and some described only "individual incidents that do not reflect a pattern in any particular police force." It further found that some of the documentation actually reflected "improvements in the situation of gay people in Mexico." The BIA concluded:

> [W]here the respondent never reported his incidents of harm to government authorities, and where the background evidence in the record is inconclusive, the Immigration Judge properly found that the respondent did not prove that the Mexican government is unwilling or unable to control those who harmed or may harm him.

As to Ornelas-Chavez's CAT claim, the BIA affirmed the IJ's decision in a one-sentence ruling. Finally, the BIA held that Ornelas-Chavez did not establish a due process violation. This timely petition for review followed.

## II.

We review the BIA's construction and application of the law de novo, subject to established principles of deference. *See Murillo-Espinoza v. INS*, 261 F.3d 771, 773 (9th Cir. 2001) (citing *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424-25 (1999)).

We review the BIA's determination that Ornelas-Chavez did not establish eligibility for withholding of removal for substantial evidence. *Andrasian v. INS*, 180 F.3d 1033, 1040 (9th Cir. 1999). We also review for substantial evidence "the factual findings underlying the BIA's determination that [Ornelas-Chavez] was not eligible for relief under the Convention Against Torture." *Zheng*, 332 F.3d at 1193. The "substantial evidence" standard requires us to uphold the BIA's determination if supported by "reasonable, substantial, and probative evidence on the record." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (quotation marks omitted). However, our review is "confined to the BIA's decision and the bases upon which the BIA relied." *Navas v. INS*, 217 F.3d 646, 658 n.16 (9th Cir. 2000) (quoting *Martinez-Zelaya v. INS*, 841 F.2d 294, 296 (9th Cir. 1988)) (quotation marks omitted).

## III.

## A.

Ornelas-Chavez claims the BIA applied the wrong legal standard in determining that he was not eligible for withholding of removal based upon the alleged persecution he suffered in Mexico at the hands of private persons. We agree.

[1] Under IIRIRA, Ornelas-Chavez may not be removed to Mexico if his "life or freedom would be threatened . . . because of [his] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). Ornelas-Chavez is entitled to the presumption that such a threat exists if he can show he suffered past persecution on account of his membership in a protected social group.[3] *See* 8 C.F.R. § 208.16(b)(1)(I); *Baballah v. Ashcroft*, 367 F.3d 1067, 1079 (9th Cir. 2004). "Persecution may be inflicted either by the government or by persons or organizations which the government is unable or unwilling to control." *Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir. 1997) (quotation marks omitted). Ornelas-Chavez can meet his burden either by offering credible and persuasive testimony, 8 C.F.R. § 208.16(b) ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration."), or by producing specific documentary evidence to support his claim, *see Al-Harbi v. INS*, 242 F.3d 882, 891 (9th Cir. 2001) (holding that "documentary evidence pertaining to the asylum applicant himself and to the events in which he was involved . . . can independently establish facts essential to . . . an asylum claim").

In concluding that Ornelas-Chavez did not establish he was

---

[3] Whether Ornelas-Chavez belongs to a protected social group is not at issue in this appeal. *See generally Hernandez-Montiel v. INS*, 225 F.3d 1084, 1094 (9th Cir. 2000) (recognizing as a distinct social group "gay men with female sexual identities in Mexico").

persecuted in the past by private parties the Mexican government was unable or unwilling to control, the BIA cited only two pieces of evidence: background country conditions and Ornelas-Chavez's failure to report the incidents to the authorities.

[2] Evidence of background country conditions alone cannot establish that specific acts of persecution did or did not occur. *See Duarte de Guinac v. INS*, 179 F.3d 1156, 1162 (9th Cir. 1999). Its proper use is "to provide information about the context in which the alleged persecution took place, in order that the factfinder may intelligently evaluate the petitioner's credibility." *Id.* Thus, the BIA's decision could not properly rest on this evidence unless it specifically held that some or all of Ornelas-Chavez's testimony was not credible in light of the background conditions. But the BIA did not do so. Because it made no adverse credibility finding, it was therefore required to accept Ornelas-Chavez's testimony, and all reasonable inferences to be drawn from it, as true. *See Zheng*, 332 F.3d at 1189 n.4.

Ornelas-Chavez offered testimonial evidence both at the hearing and in his declaration supporting his asylum application, which described his alleged persecution and, more importantly, the indifference and danger that characterized his dealings with government officials. While only a very small boy, his teacher chastised him for suffering sexual abuse. At his father's bidding, his hometown police jailed him and threatened to do so again if he continued dating men. His supervisors at the Uruapan state prison refused to keep co-workers from harassing him for being homosexual. Even in Guadalajara, where Ornelas-Chavez for a short time performed in transvestite shows, he had "to go out in the street without any makeup . . . so [he was] not attack[ed] by the police." ER at 78. Indeed, when asked directly why he did not report his alleged persecution to the police, Ornelas-Chavez answered, "Because the same police mistreated you and harrasse[d] you. Even two of my friends were assassinated." ER

at 54. The latter statement refers to the Uruapan police's brutal maiming and murder of two of Ornelas-Chavez's homosexual friends. Although the BIA was required to accept all this testimony regarding Ornelas-Chavez's experience with government authorities as true, its decision mentions only that "the respondent never reported his incidents of harm to government authorities."

We must therefore conclude that the *only* credible testimonial evidence the BIA considered in determining that the Mexican government was unwilling or unable to control Ornelas-Chavez's alleged persecutors was the fact that Ornelas-Chavez did not report the incidents of abuse he suffered to the police. Such treatment of the evidence was tantamount to making the reporting of private persecution a sine qua non for the success of Ornelas-Chavez's withholding of removal claim.

**[3]** Neither IIRIRA nor the regulations implementing it require that an alien seeking withholding of removal based on third-party persecution must have reported that persecution to the authorities. In fact, any such requirement would contradict the BIA's own precedent. *See, e.g.*, *In re S- A-*, 22 I. & N. Dec. 1328, 1335 (BIA 2000) (holding that an applicant who convincingly demonstrated that she "could not rely on the authorities to protect her" from her father's abuse and that, by turning to governmental authorities for help, "her circumstances may well have worsened," was not required to report private persecution to government authorities to qualify for asylum).

**[4]** Moreover, a reporting requirement conflicts with the way this court has implicitly handled a petitioner's evidence of governmental unwillingness or inability to control private persecution. It is true that "where non-governmental actors are responsible for persecution . . . we consider whether an applicant reported the incidents to police." *Baballah*, 367 F.3d at 1078. We do so "because in such cases a report . . . may

show governmental inability to control the actors." *Id.* But we have never held, as the BIA essentially did here, that reporting private persecution is a prerequisite for relief. Indeed, in *Reyes-Reyes v. Ashcroft*, 384 F.3d 782 (9th Cir. 2004), a case similar to this one, we stated that the imposition of a reporting requirement "would indeed be troubling," especially in light of precedent documenting police abuse of men with female sexual identities in Latin America and record evidence that victims of rape generally under-report such crimes. *Id.* at 789 n.3. However, we declined there to decide whether imposing a per se reporting requirement under section 1231(b)(3) was improper because we granted the petition on other grounds. *See id.* at 789. In contrast, in *Castro-Perez v. Gonzales*, 409 F.3d 1069 (9th Cir. 2005), we denied the petition of a young Honduran woman who was raped twice by her boyfriend because she had not carried her burden of showing the government was unable or unwilling to control her boyfriend's abusive conduct. *Id.* at 1070-72. But we reached this conclusion both because she failed to report the rapes to government authorities *and* because her reasons for not reporting them— she believed "the police would not investigate a date rape, and . . . she was afraid of how her father would react"—did not compel our finding that "the Honduran government must bear some responsibility for Castro-Perez's rapes." *Id.* In other words, we denied her petition only after considering whether she had provided sufficient evidence to justify not reporting her alleged persecution to the authorities. *Accord Boer-Sedano v. Gonzales*, 418 F.3d 1082, 1088 (9th Cir. 2005) (considering, where petitioner claimed fear kept him from reporting private persecution to the police, whether that fear was reasonable under the circumstances).

[5] We now make explicit what was implicit in these earlier cases: an applicant who seeks to establish eligibility for withholding of removal under section 1231(b)(3) on the basis of past persecution at the hands of private parties the government is unwilling or unable to control need not have reported that persecution to the authorities if he can convincingly

establish that doing so would have been futile or have subjected him to further abuse.

Ornelas-Chavez argues that, when reviewed under the correct legal standard, the evidence in the record supports a finding that he is entitled to withholding of removal under section 1231(b)(3). But where the BIA applies the wrong legal standard to an applicant's claim, the appropriate relief from this court is remand for reconsideration under the correct standard, not independent review of the evidence. *See INS v. Orlando Ventura*, 537 U.S. 12, 16-17 (2002); *Azanor v. Ashcroft*, 364 F.3d 1013, 1020-21 (9th Cir. 2004).

**[6]** Because the BIA improperly applied a reporting requirement in its analysis of Ornelas-Chavez's section 1231(b)(3) claim, we grant his petition on this claim and remand to the BIA for reconsideration of the evidence under the correct standard.

### B.

The BIA rendered its CAT decision in a single sentence, saying simply that it "agree[d] with the Immigration Judge that the respondent did not prove that, if removed to Mexico, he more likely than not will suffer torture as specifically defined by regulation." "[T]his court has required the Board to 'state its reasons and show proper consideration of all factors when weighing equities and denying relief.' " *Hassan v. INS*, 927 F.2d 465, 467 (9th Cir. 1991) (quoting *Mattis v. INS*, 774 F.2d 965, 968 (9th Cir. 1985)). Where, as here, the BIA does not expressly state whether it conducted de novo review and the lack of analysis in its order suggests it gave significant weight to the IJ's decision, we will review the IJ's decision "as a guide to what lay behind the BIA's conclusion." *Kozulin v. INS*, 218 F.3d 1112, 1115 (9th Cir. 2000) (citing *Avetova-Elisseva v. INS*, 213 F.3d 1192, 1196-97 (9th Cir. 2000) and *Alaelua v. INS*, 45 F.3d 1379, 1381-82 (9th Cir. 1995)). But the BIA may not discharge the burden of support-

ing its decision with a proper consideration of all factors by adopting an IJ's decision that is deficient. *See Tukhowinich v. INS*, 64 F.3d 460, 465 (9th Cir. 1995).

The IJ concluded that Ornelas-Chavez did not meet his burden of proof under CAT because the evidence did not establish that the government "sanctioned" his torture. This decision is deficient, requiring us to remand, because the IJ applied the wrong legal standard.

[7] To qualify for protection under CAT, Ornelas-Chavez must establish that he suffered torture, i.e., severe pain or suffering intentionally inflicted for discriminatory purposes "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *See* 8 C.F.R. § 208.18(a)(1). "Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 208.18(a)(7). In *Zheng* we reversed a BIA decision interpreting the regulations implementing CAT to require that public officials be "willfully accepting of" torture. *See Zheng*, 332 F.3d at 1194. We held they require only that government officials "turn a blind eye" to the torture. *Id.* at 1196 ("The correct inquiry . . . is whether a respondent can show that public officials demonstrate 'willful blindness' to the torture of their citizens by third parties, or . . . would turn a blind eye to torture." (citations and quotation marks omitted)). Because "sanction"[4] connotes greater volition and approbation than "acquiescence,"[5] "awareness,"[6] "willful blindness,"[7] and even "willful acceptance," the IJ

---

[4]BLACK'S LAW DICTIONARY 1369 (8th Ed. 2004) ("To approve, authorize, or support").

[5]*Id.* at 25 ("[T]acit or passive acceptance; implied consent to an act").

[6]MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 81 (10th Ed. 1998) ("[R]ealization, perception, or knowledge" and "vigilance in observing or alertness in drawing inferences from what one experiences").

[7]BLACK'S LAW DICTIONARY 1630 ("Deliberate avoidance of knowledge of a crime, esp[ecially] by failing to make a reasonable inquiry about suspected wrongdoing despite being aware that it is highly probable.").

used a higher legal standard to assess Ornelas-Chavez's CAT claim than is permitted under the law.

The government claims the IJ's "misstatement" of the law was harmless because "none of the mistreatment of which [Ornelas-Chavez] complains occurred by or at the instigation of or with the consent or acquiescence of a public official 'who ha[d] custody or physical control' of him." The government relies on *In re J-E-*, 23 I. & N. Dec. 291 (BIA 2002) (en banc), for the proposition that 8 C.F.R. § 208.18(a)(1) requires an applicant to have been in the custody or control of a public official at the time of his torture. But we clearly rejected that interpretation of the regulation in *Azanor*. *See* 364 F.3d at 1020. Therefore, we reject the government's harmless error claim.

**[8]** The dissent argues that the IJ's "errant word choice" amounts to harmless error since a closer inspection of the IJ's actual "mode of analysis" reveals that she did not review the evidence under a different standard than the regulations dictate. Dissenting Op. at 9990. The dissent bases this argument on the IJ's finding that Ornelas-Chavez "presented no evidence that the authorities refused to protect him or that the authorities did not protect him, since he never reported any of these incidents to authorities." But the dissent's argument is unpersuasive because the standard implicit in this finding is also higher than that dictated by CAT.[8] As indicated above, the implementing regulations require an applicant to prove that, before the alleged torture occurred, a public official had "awareness of such activity and thereafter breach[ed] his or her legal responsibility to intervene to prevent such activity."

---

[8]We also note that the IJ's finding, which simply ignores Ornelas-Chavez's testimony, is unsupported by substantial evidence. Ornelas-Chavez said at his hearing both that he told his second-grade teacher he had sexual intercourse with a man and that he repeatedly told his supervisor at the state prison that co-workers harassed and beat him because he was gay. Thus, the record shows, in direct contradiction to the IJ's finding of fact, that Ornelas-Chavez did report his alleged torture.

8 C.F.R. § 208.18(a)(7). With logic similar to that underpinning the BIA's section 1231(b)(3) decision, the IJ's decision rests on the unwarranted premise that the only way a public official can have such awareness, and thus that the duty to intervene can arise, is if the applicant reports the alleged torture to him. But, as with section 1231(b)(3), we have never required that an applicant report his alleged torture to public officials to qualify for relief under CAT. Indeed, in *Zheng* we specifically held that CAT does not even require that a public official have "actual knowledge" of the alleged torture. *See Zheng*, 332 F.3d at 1196. It is enough that public officials could have inferred the alleged torture was taking place, remained willfully blind to it, or simply stood by because of their inability or unwillingness to oppose it. *See id.* at 1195 n.8. By assuming in its analysis of Ornelas-Chavez's CAT claim that public officials must be informed of alleged torture by the victim, the IJ imposed a higher burden of proof than is permitted under CAT, and consequently her resulting decision was improper.

Like the dissent, we have our doubts about whether the record evidence supports a claim for relief under CAT. But it is not our job to make that determination. Our job is to ensure that the IJ employed the proper legal standards in reaching her decision and that her conclusions are supported by substantial evidence. In performing this task, we are limited to "grant[-ing] or deny[ing] the petition for review based on the [IJ's] reasoning rather than our independent analysis of the record." *Azanor*, 364 F.3d at 1021. With this restriction in mind, we note what the IJ did *not* find. First, she did not specifically find that the rapes or beatings Ornelas-Chavez suffered in his youth failed to satisfy the high standard for torture as defined in 8 C.F.R. § 208.18(a)(1). Second, the IJ did not specifically find that those rapes and beatings, though they occurred when Ornelas-Chavez was still a boy, failed to provide sufficient support for the likelihood that he would be tortured if returned to Mexico. Third, she did not find that either Ornelas-Chavez's teacher or his supervisor at the prison had not been

informed of the alleged torture "prior to" its occurrence, as required by 8 C.F.R. § 208.18(a)(7), such that she or he could not have breached the "legal responsibility to intervene to prevent such activity." Fourth, she did not find that either the teacher or the prison supervisor was not a "public official" to whom this duty to intervene applied. The IJ did not make any of these specific findings. Therefore, we cannot affirm the IJ's decision on any of these specific grounds, even if we believe substantial evidence in the record supports them. *See Navas*, 217 F.3d at 658 n.16 ("[T]his court cannot affirm the BIA on a ground upon which it did not rely."). Instead, the IJ concluded simply that Ornelas-Chavez failed to show that the authorities "sanctioned" his alleged torture because he did not report it. As discussed above, this conclusion, besides being unsupported by substantial evidence in the record, misrepresents the relevant legal standard.

**[9]** Because the IJ's decision is fatally flawed, we must reverse the BIA's decision and remand. *See Tukhowinich*, 64 F.3d at 465. Again, whether the record establishes that Ornelas-Chavez is eligible for withholding of removal under CAT should be determined under the correct legal standard on remand, not by our own independent review of the evidence. *See Azanor*, 364 F.3d at 1020-21.

IV.

We hold that the BIA applied impermissibly strict standards to both Ornelas-Chavez's section 1231(b)(3) claim and his CAT claim. Accordingly, we grant Ornelas-Chavez's petition for review and remand the case to the BIA for further proceedings consistent with this opinion.

**PETITION GRANTED IN PART, REMANDED**.

O'SCANNLAIN, Circuit Judge, dissenting:

In this case our modest task is to decide whether the Board of Immigration Appeals' ("BIA") decision to deny Petitioner Ornelas-Chavez's claims was free of legal error and supported by substantial evidence. Because neither sympathy for the petitioner nor distrust of the BIA or the Immigration Judge ("IJ") should compromise a careful assessment of the administrative decisions and record evidence, I respectfully dissent.

I

First, the court holds that the BIA applied the wrong legal standard to Ornelas-Chavez's claim to withholding of removal under 8 U.S.C. § 1231(b)(3) because it imposed a strict "reporting requirement" to establish government persecution. Maj. Op. at 9970-74. With respect, it did no such thing.

A

Any fair reading of the BIA's decision demonstrates that it applied the proper legal standard. In relevant part, the BIA stated:

> The respondent suffered an incident of harm, a detention of several hours apparently at this [sic] request of his father, at the hands of government agents. This single incident does not rise to the level of persecution. All of the other harm suffered by the respondent occurred at the hands of private citizens. The respondent did not report any of these incidents to government authorities.
>
> . . . Accordingly, where the respondent never reported his incidents of harm to government authorities, *and where the background evidence in the record is inconclusive, the Immigration Judge prop-*

*erly found that the respondent did not prove that the Mexican government is unwilling or unable to control those who harmed or may harm him.*

(Emphasis added.) The majority, adopting Ornelas-Chavez's argument wholesale, seems to fixate on the last sentence of the first quoted paragraph: "The respondent did not report any of these incidents to government authorities." Indeed, with only a passing nod to the sentence's context, the majority distorts entirely the BIA's reasoning.

The BIA did not apply nor did it adopt a strict "reporting requirement." True, it observed that there was no evidence that Ornelas-Chavez reported the alleged incidents. However, as the majority concedes, it then considered this dearth of evidence in combination with the background country conditions evidence, which failed to demonstrate a pattern of indifference by the government. The BIA concluded, in light of these categories of evidence, that the IJ could appropriately find "that the respondent did not prove that the Mexican government is unwilling or unable to control those who harmed or may harm him."

Under our circuit's case law, this is an entirely proper mode of analysis. The persecution of which Ornelas-Chavez complains must be shown to have been perpetrated by the government, or else Ornelas-Chavez must show that the government "is unwilling or unable to control those elements of its society responsible for targeting a particular class of individuals." *Avetova-Elisseva v. INS*, 213 F.3d 1192, 1196 (9th Cir. 2000) (citation and internal quotation marks omitted). Accordingly, whether the petitioner has reported the incidents to the authorities is clearly relevant to, even if not dispositive of, the ultimate question of whether the government was "unwilling or unable to control" the persecutors. *See, e.g.*, *Baballah v. Ashcroft*, 367 F.3d 1067, 1078 (9th Cir. 2004) (citations omitted).

In this light, it is clear that the BIA's consideration of general country conditions stood to confirm its conclusion that

Ornelas-Chavez did not meet his burden. That the BIA considered such background evidence itself conclusively demonstrates that the inquiry was not terminated by any rigid reporting requirement. Ultimately, I think it clear that the BIA asked and answered the right question: whether Ornelas-Chavez's alleged persecutors were parties whom the Mexican authorities were unwilling or unable to control. The BIA was correct to treat Ornelas-Chavez's failure to report the alleged persecution as *relevant* to that question.

In arriving at its errant conclusion, the majority observes that the BIA "cited only two pieces of evidence," and since one of them was inconclusive, it must have been improper that the other—the alleged "reporting requirement"—was "a sine qua non for the success of Ornelas-Chavez's withholding of removal claim." Maj. Op. at 9971, 9972. But where, I wonder, is the flaw in the BIA's analysis?

Presumably Ornelas-Chavez had two options: to prove that the government was unwilling or unable to control such persecution generally, or to prove that it was unwilling or unable to control his persecutors specifically. *See, e.g.*, *Castro-Perez v. Gonzales*, 409 F.3d 1069, 1072 (9th Cir. 2005) (considering country reports to determine whether the Honduran government was willing or able to control rape generally, and considering the petitioner's specific situation). Since Ornelas-Chavez failed to do the former, to meet his burden it was necessary that he have done the latter. And because there is little *other* evidence in the record to suggest the government's disposition towards Ornelas-Chavez's particular troubles, the BIA properly deemed rather important in this case—"a sine qua non," even!—that Ornelas-Chavez failed to report the alleged abuse to government authorities.[1] So, the majority

---

[1]There is no evidence that the authorities had (or should have had) knowledge of the rapes or beatings. Ornelas-Chavez presented evidence that government officials witnessed a couple incidents of harassment, but no incidents of persecution or torture.

concedes that reporting *vel non* may be relevant, *see* Maj. Op. at 9972-73; yet it grants the petition because in this particular case the failure to report is *too* relevant.

The BIA did not, as the majority seems to suggest, improperly consider background country conditions as "establish[-ing] that specific acts of persecution occurred or did not occur." Maj. Op. at 9971. Although the BIA, having made no adverse credibility determination, was required to accept Ornelas-Chavez's testimony as factually true, it was not required to adopt his preferred legal conclusion: that the authorities would not have acted to curb the persecution he alleges took place. The background evidence in the record was obviously relevant to the merits of that issue, and the BIA was entitled, if not obligated, to consider it. *See Castro-Perez*, 409 F.3d at 1072; *Avetova-Elisseva*, 213 F.3d at 1198-99; *Andriasian v. INS*, 180 F.3d 1033, 1042-43 (9th Cir. 1999).[2] The testimony provided by Ornelas-Chavez, while also relevant, was evidence of an anecdotal, subjective variety and thus not particularly probative. Indeed, the background evidence substantially negates Ornelas-Chavez's perception. *See infra* section I.B.1.

Our standard of review in immigration cases is well-established: we must affirm the BIA if the record contains substantial evidence for its decision; we cannot justify granting the petition for review merely by pointing to *other* record evidence which, in our own view, supports the alien's claim. *See INS v. Elias-Zacarias*, 502 U.S. 478, 481 & n.1 (1992). The majority cannot say that Ornelas-Chavez's testimony *compels* a rational fact finder to conclude that the government was unwilling or unable to control his alleged persecutors. Thus, the majority opts for another, more innovative approach: it holds that the BIA applied *the wrong legal*

---

[2]The majority's attempt to limit the use of background country conditions evidence to credibility determinations, *see* Maj. Op. at 9971, is entirely without authority.

*standard*—simply because there exists supportive evidence that the BIA failed explicitly to discuss. *See* Maj. Op. at 9971-72. But Ornelas-Chavez's testimony was not somehow legally distinct from the balance of the record; it was merely additional evidence on the same "unwilling or unable to control" question. Accordingly, the majority's holding seems little more than a willful circumvention of the Supreme Court's prescribed standard of review.

In short, the majority goes to great lengths to divine in the BIA's analysis some kind of *per se* rule, which it can then merrily reject. As I have sought to demonstrate, such "reporting requirement" is of the majority's own imagining. Surely one may infer much from the typically brief text of an administrative decision—especially when one is all too eager to conjure a meaning that will justify granting the petition for review. *Cf. Kumar v. Gonzales*, 435 F.3d 1019, 1037 (9th Cir. 2006) (Kozinski, J., dissenting) ("[T]he majority picks apart the [BIA's] findings piece by piece, scrutinizing [its] every sentence as if it is completely unconnected to the rest of the opinion."). Such creative invention, however, is not appropriate to our role in reviewing the lawful adjudication of an administrative body.

B

Had the majority given the BIA's decision a fair reading, it could not then hold that Ornelas-Chavez met his burden of showing that the evidence would compel any reasonable fact finder to conclude that he was more likely than not to suffer persecution upon his return to Mexico. *Singh v. INS*, 134 F.3d 962, 966 (9th Cir. 1998).

1

There is no evidence of past persecution, as defined by the regulations, in this case. The Mexican government was not involved in any persecution of Ornelas-Chavez; the single,

six-hour detention by a reluctant local police chief, at the request of Ornelas-Chavez's father, does not rise to that level. *See, e.g.*, *Prasad v. INS*, 47 F.3d 336, 339-40 (9th Cir. 1995).

Critically, the evidence also falls short of compelling a finding that any past *private* "persecution" at issue was perpetrated by parties whom the government was unwilling or unable to control. Ornelas-Chavez has not "convincingly established"—or proven by any standard—that his resort to government authorities would have been futile. *Cf. Korablina v. INS*, 158 F.3d 1038, 1045 (9th Cir. 1998). As the BIA found, the relevant background evidence is, at best, inconclusive. Ornelas-Chavez relies on little more than a bare assumption that the police would have done nothing *had* he reported the abuse—a showing that we have previously deemed insufficient. *See Castro-Perez*, 409 F.3d at 1072.

The administrative record provides little support for Ornelas-Chavez's claim of past persecution. The evidence regarding general country conditions, while perhaps revealing societal disfavor of homosexuals, does not demonstrate that the authorities would have been inattentive to the primary incidents of persecution alleged here: the rape and physical abuse *of a young child*. Even if the majority were willing to overlook the relevance of Ornelas-Chavez's age—allowing him to gild his allegations in the armor of sexual orientation and gender identity—there is no evidence in the record that the Mexican authorities would have viewed the incidents in similar terms and thus permitted the abuse.

Even assuming that a few individual police officers were beholden to Ornelas-Chavez's father because they rented a house on his land, Ornelas-Chavez makes no allegation that this potential bias somehow seeped into all (or even most) persons holding Mexican authority. It is true that Ornelas-Chavez's teacher failed to take any action in response to his allegations of sexual contact. But at best, this testimony establishes one teacher's ineptitude; it does not *compel* a finding

that the Mexican authorities generally would have been indifferent to the rape of a young child.[3] Lastly, I note that when, at the prison at which he worked, Ornelas-Chavez informed his supervisor of the abuse by his coworkers, the supervisor exhibited a willingness to control the alleged conduct by offering to adjust Ornelas-Chavez's shift so that he could avoid his would-be persecutors. Ornelas-Chavez cannot prove that this measure would have been inadequate because he chose to resign his employment. That the supervisor "took no action against the co-workers," Maj. Op. at 9967, is of little relevance.

The various items of evidence Ornelas-Chavez put forth fail to support his claim because his subjective perceptions of government officials are not relevant—much less dispositive. The critical inquiry as to government responsiveness is *objective*, and we have always considered the "unwilling or unable to control" requirement in that context. *See, e.g., Malty v.*

---

[3]Quite the contrary, the administrative record includes a U.S. Department of State country report, dated March 31, 2003, which documents extensive efforts by the Mexican government to promote the well-being of the country's children. The government has in place the National Institute for the Integral Development of the Family, which fields complaints of abuse against children. A 2000 law provides for imprisonment of up to ten years for the sexual corruption of a minor under 16 years of age; parents convicted of such crimes are stripped of custody over their children. Accomplices to sexual abuse face similar prison terms. In 2000, the Mexican Congress also passed a constitutional amendment "to protect the rights of children and teenagers and ensure respect for their dignity." Moreover, the Protection of the Rights of Children and Adolescents Law "provides for the right to life, nondiscrimination, healthy living conditions, protection against threat to liberty and physical abuse, a healthy family life, health services, equal treatment for persons with disabilities, education, pursuit of happiness, and freedom of thought and expression." Penalties for violation include fines and imprisonment.

The same State Department country report also documents ongoing dangers faced by Mexico's youth, but the record evidence falls far short of compelling the conclusion that the government is "unwilling or unable to control" persecution of the type primarily alleged here.

*Ashcroft*, 381 F.3d 942, 948 (9th Cir. 2004). Ornelas-Chavez's personal belief that the relevant Mexican authorities would have been unwilling to shield him from persecution is grossly insufficient.

In sum, while I do not discount nor make light of the harms Ornelas-Chavez has apparently suffered, I must also conclude that the evidence does not *compel* a finding—as it must do under our limited standard of review—that the harms were occasioned by persons whom the government was unwilling or unable to control.

2

Having failed to produce compelling evidence of past persecution by actors whom the government was unwilling or unable to control, Ornelas-Chavez would not be entitled to a presumption of future persecution. *See* 8 C.F.R. § 1208.13(b)(1). His claim to withholding of removal would then fail if he also falls short of independently establishing a clear probability of future persecution. *See Lim v. INS*, 224 F.3d 929, 938 (9th Cir. 2000).

a

On this record, there simply is insufficient showing that homosexuals are currently subject to official persecution in Mexico. The U.S. Department of State's June 1997 country report documented "no evidence of systematic official persecution of homosexuals," and Ornelas-Chavez's other evidence was not to the contrary. A report from a private group, dated May 2000, stated that "repression by . . . authorities is now the exception, not the rule," and noted that societal attitudes are trending towards tolerance.

The record evidence further demonstrates extensive legal, political, and cultural advances by homosexuals in Mexico, including the enactment of legislation prohibiting discrimina-

tion on the basis of sexual orientation, wide acceptance of participation by homosexuals in two of the three major political parties, and the election of openly homosexual government representatives. To the extent private persecution occurs, the record suggests that the government's response has changed. One news report in the record, for example, notes that the Mexico City police "have set up a unit specializing in dealing with homophobic crimes, and are to get sensitivity training."

b

Nor was the evidence so compelling that any rational fact finder must conclude that Ornelas-Chavez, *individually*, would more likely than not be subject to persecution by actors whom the government was unwilling or unable to control. 8 C.F.R. § 1208.16(b)(1)-(2); *see Sael v. Ashcroft*, 386 F.3d 922, 925 (9th Cir. 2004); *Hoxha v. Ashcroft*, 319 F.3d 1179, 1185 (9th Cir. 2003). While the record reveals societal disfavor of homosexuality generally, it exposes few incidents of actual persecution. These general country conditions do not compel reversal of the BIA. More directly, there is simply no evidence that Ornelas-Chavez is likely to be singled out by the government or by private forces whom the government is unwilling or unable to control.[4]

Read as a whole, the record is not such that a reasonable fact finder *must* conclude that Ornelas-Chavez is more likely

---

[4]It is true that Ornelas-Chavez's father may be the lone exception. But the record discloses no evidence that his father is seeking him out for the purpose of persecution such that it is likely to happen again. *Cf., e.g.*, *Mendoza-Perez v. INS*, 902 F.2d 760, 762 (9th Cir. 1990). Since Ornelas-Chavez reached adulthood, he has had only one run-in with his father. This incident, a 1998 altercation, was an isolated occurrence; it took place when the two encountered each other by chance at the home of Ornelas-Chavez's aunt. Ornelas-Chavez himself acknowledged living in Mexico without incident for many years prior. As such, the incident does not compel a conclusion contrary to the one reached by the BIA.

than not to be persecuted in the future if he is returned to Mexico.[5]
I would affirm the BIA's decision because it is supported by
substantial evidence.

## II

I must also dissent from the majority's holding that the BIA
applied an incorrect legal standard as to the level of govern-
ment involvement required for relief under the Convention
Against Torture ("CAT"). Maj. Op. at 9974-78. Again, the
majority's reading of the relevant administrative decision is
partisan and inaccurate. Further, there is absolutely no evi-
dence of torture of homosexuals by the Mexican government
(or by private parties with the government's consent or acqui-
escence) in this record. Random incidents of private violence
simply cannot support the notion that official torture of homo-
sexuals is systematic or even common. As such, the IJ's deci-
sion on the CAT claim is supported by substantial evidence.

## A

The applicable regulations define "torture" as "severe pain
or suffering, whether physical or mental" when intentionally
inflicted "with the *consent or acquiescence* of a public official
or other person acting in an official capacity." 8 C.F.R.
§ 208.18(a)(1) (emphasis added). In this case, the IJ found

---

[5]The showing made by Ornelas-Chavez is not nearly as compelling as
those we have considered previously. In *Boer-Sedano v. Gonzales*, 418
F.3d 1082 (9th Cir. 2005), the petitioner presented evidence that he had
been raped repeatedly *by a police officer*. *Id.* at 1086. In *Hernandez-
Montiel v. INS*, 225 F.3d 1084 (9th Cir. 2000), the petitioner was raped
twice by police officers. *Id.* at 1088. In the latter case, the petitioner pre-
sented expert testimony and documentation showing that the government
would not protect a particular subclass: gay men with female sexual iden-
tities. *Id.* at 1094. Of course, the *Hernandez-Montiel* case is six years old
—and much of the record evidence it cited is far older. The important
point, in any case, is that Ornelas-Chavez has not made a remotely similar
showing.

that Ornelas-Chavez had "provided no evidence of past torture or any mental or physical intentionally inflicted severe pain or suffering that is *sanctioned* by a public official." (Emphasis added.) The majority seizes upon the word "sanctioned" to assert an erroneous application by the IJ of a legal standard "higher" than that prescribed in the regulations. Maj. Op. at 9975.

While the IJ may have employed imprecise diction in that passage, the majority is again too keen to find fault in the agency decision we now review. Earlier in its order, the IJ explained, in part, that "[t]he Respondent presented no evidence that the authorities refused to protect him or that the authorities did not protect him, since he never reported any of these incidents to the authorities." *Id.* at 9976. This phraseology indicates that the IJ considered whether the authorities were aware of the alleged abuses such that they could possibly "consent or acquiesce." Thus, the IJ necessarily found that Ornelas-Chavez's evidence fell short of even the proper "consent or acquiescence" standard. Although the word "sanctioned" arguably suggests affirmative approval by the government, there is no indication in the opinion that the IJ actually reviewed the evidence for conduct beyond the government's "tacit or passive acceptance" or "implied consent to an act." I also find it significant that the IJ's errant word choice was simply part of its summary declaration at the end of the opinion, not in any way enmeshed in the actual analysis of the facts.

There was not, as the majority suggests, implicit in the IJ's finding a standard "also higher than that dictated by CAT." Maj. Op. at 9976. In so asserting, the majority again lays bare the analytical flaw that infects its entire opinion: it posits that "the IJ's decision rests on the unwarranted premise that the only way a public official can have such awareness . . . is if the applicant reports the alleged torture to him." *Id.* at 9977. Reporting is not the *only* way a public official can have such awareness, but in this case there was absolutely no suggestion

of an alternative. No government agent witnessed the alleged torture; there was no suggestion that someone else may have told the government about it; and there was insufficient evidence that the government is willfully blind to such torture generally. The IJ's statement, read in context, was clearly an assessment of the facts of this particular case. It was not an erroneous, general statement of law upon which we could grant the petition for review.

In sum, a fair reading of the decision leads to the conclusion that the word "sanctioned" was inconsequential to the analysis and ultimately harmless.[6] Yet the majority excitedly reverses the IJ on the CAT claim as if one errant word choice, bereft of context and contained in a summary sentence, constituted the smoking gun for which it was searching. *See Kumar*, 435 F.3d at 1035 (Kozinski, J., dissenting) ("This is the nub of the IJ's reasoning, which the majority ignores, preferring to nitpick the IJ's isolated statements."). Rather than condemn the IJ solely on the authority of *Black's Law Dictionary* and *Merriam-Webster's Collegiate*, I would look to the mode of analysis it actually employed. The IJ applied the correct standard and committed no error of any consequence to this case.

---

[6]The majority rejects the harmlessness of the misstatement on the basis of the government's argument, under an invalidated BIA decision, that Ornelas-Chavez must have been in the "custody or physical control" of a *public official*. Maj. Op. at 9976. But *the IJ* never asserted that Ornelas-Chavez must have been in the custody of a public official; rather, it applied the correct legal standard—that he must have been in the custody or physical control "of a perpetrator." *See Azanor v. Ashcroft*, 364 F.3d 1013, 1019 (9th Cir. 2004) (citing 8 C.F.R. § 208.18(a)(6)). The majority, it seems, has seized on the government's curious argument in order to engage in a bit of misdirection. Obviously the government's litigation position has nothing to do with the IJ's analysis, which, I would have thought, was the actual subject of our review.

B

Because, in my view, the IJ did not apply an erroneous standard to his CAT claim, the final step in our review is to consider whether the record evidence is so compelling that any rational finder of fact would conclude that Ornelas-Chavez more likely than not would be tortured, with the consent or acquiescence of the government, upon his return to Mexico. *Ochoa v. Gonzales*, 406 F.3d 1166, 1172 (9th Cir. 2005). Clearly, the record evidence does not even come close to meeting this stringent standard.

1

The majority seeks to curtail such inquiry by suggesting that "the IJ concluded simply that Ornelas-Chavez failed to show that the authorities 'sanctioned' his alleged torture because he did not report it," and that we therefore cannot affirm the IJ's decision on any other ground even if supported by substantial evidence. Maj. Op. at 9977-78.

But the IJ's decision was not so cabined. She found no past torture because, *in part*, Ornelas-Chavez did not report any abuse. But the majority ignores at least four paragraphs in which the IJ discussed the facts that she felt undermined Ornelas-Chavez's claims of *future* harm. She considered "[Petitioner's] testimony and evidence offered by the [Petitioner]," and concluded that Ornelas-Chavez had "not shown that he is more likely than not to be tortured if he were to be removed to Mexico." Given that conclusion, the IJ necessarily found many of the facts the majority claims it did not find.[7]

---

[7]First, the IJ did indeed find that the rapes and beating Ornelas-Chavez suffered in his youth did not qualify as "torture," because no government actor was aware of such abuses before they occurred. Second, the IJ found that Ornelas-Chavez had failed to prove the likelihood that he would be tortured if returned to Mexico. Third, the IJ's finding that Ornelas-Chavez did not report any abuses to the government necessarily means that she found he did not inform anyone of torture "prior to" its occurrence.

As such, we should consider any record evidence that supports the IJ's finding that Ornelas-Chavez failed to meet his burden of showing a likelihood of torture upon his return to Mexico. *See Turcios v. INS*, 821 F.2d 1396, 1398 (9th Cir. 1987) ("The substantial evidence test is essentially a case-by-case analysis requiring review of the whole record.").[8]

2

As already noted, the regulations define torture for CAT purposes as severe pain or suffering "inflicted by or at the instigation of *or with the consent or acquiescence* of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1) (emphasis added). In turn, "[a]cquiescence of a public official requires that the public official, *prior to the activity constituting torture*, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." *Id.* § 208.18(a)(7) (emphasis added); *see Kamalthas v. INS*, 251 F.3d 1279, 1282 (9th Cir. 2001). In short, the "consent or acquiescence" requirement means that the government must be aware of the allegedly tortuous conduct, or at least willfully blind to it. *Zheng v. Ashcroft*, 332 F.3d 1186, 1188-89 (9th Cir. 2003) (citation omitted).

Past torture does not create a presumption of entitlement to CAT relief, although it is relevant to the ultimate inquiry: whether "it is more likely than not that [the petitioner] would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2); *see Mohammed v. Gonzales*, 400 F.3d 785, 802 (9th Cir. 2005) (citing 8 C.F.R.

---

[8]The cases cited by the majority say only that we will not apply in the first instance the correct legal standard where the agency applied an erroneous standard, *see Azanor v. Ashcroft*, 364 F.3d 1013, 1020-21 (9th Cir. 2004), and that we will not decide a case on an entirely separate ground which the agency did not consider, *see Navas v. INS*, 217 F.3d 646, 658 n.16 (9th Cir. 2000). Those cases are not applicable here.

§ 1208.16(c)(3)). There is no evidence on this record that the Mexican authorities were aware of or willfully blind to the past abuses perpetrated by Ornelas-Chavez's father, cousins, or others.[9] By his own admission, Ornelas-Chavez never told anyone about the rapes he endured as a child. The lone exception was his confession to a school teacher that he had been sexually abused. However, the teacher was not informed of the alleged torture "prior to" its occurrence such that she could breach a legal duty to prevent it. *See* 8 C.F.R. § 208.18(a)(7).[10] The allegation of an attempt by Ornelas-Chavez's co-workers to smother him with a pillow—which, if anything, constitutes only *attempted* torture—suffers from the same flaw: the supervisor was not aware of the incident until after its occurrence. Moreover, as suggested above, the record does not compellingly demonstrate that the authorities were willfully blind to such conduct. As such, I must conclude that on this record there is no evidence of past torture, as defined by the regulations, to be considered under Ornelas-Chavez's CAT claim.

---

[9]For purposes of this discussion, I assume that the rapes and beatings Ornelas-Chavez suffered at the hands of his cousins and father, respectively, constitute torture. *See Al-Saher v. INS*, 268 F.3d 1143, 1147 (9th Cir. 2001) (sustained beatings), *amended by* 355 F.3d 1140 (9th Cir. 2004); *cf. Lopez-Galarza v. INS*, 99 F.3d 954, 963 (9th Cir. 1996) ("The effects of rape appear to resemble the effects of torture."). I know of no other allegations of past conduct that would qualify under the regulatory definition.

As to the prior knowledge of a public official, it is true that the police detained Ornelas-Chavez for six hours when he was 16 years old. But this action was in no way connected to an incident of torture.

[10]For this reason, the majority is clearly incorrect to suggest that the IJ's finding was unsupported by substantial evidence. Ornelas-Chavez told his teacher that he "had had sex with a male." But he further explained in a written declaration that he did not tell his teacher exactly what happened —the alleged rape—because his cousins had threatened him. At the hearing, Ornelas-Chavez was asked repeatedly whether he ever told anyone about the alleged rapes and other instances of abuse, and each time he answered "no" without qualification.

As to the ultimate question, the likelihood that Ornelas-Chavez will be tortured in the future if removed to Mexico, the evidence utterly falls short. It is first worth noting that the sexual abuse took place during Ornelas-Chavez's youth, specifically between the ages of six and twelve. Circumstances have so fundamentally changed—he is now an adult—that Ornelas-Chavez is rather unlikely to be subjected to future injury in the form of rape. As noted, the same conclusion applies to the beatings to which Ornelas-Chavez was subjected by his father. And as to the attempted assault by Ornelas-Chavez's co-workers at the state prison, there is simply no indication that these would-be torturers have singled out Ornelas-Chavez such that he would again be a target.

The evidence of general country conditions as it pertains to Mexican homosexuals does not paint a picture so dire as to compel reversal of the BIA decision. *See* 8 C.F.R. § 1208.16(c)(3)(iii)-(iv). Quite the contrary, the record contains numerous references to an ever-improving situation. And although there have been some homosexuality-related murders documented over five years, there are, according to this record, as many as 12,600,000 Mexicans of homosexual orientation.[11] Thus, it is impossible to conclude that "more likely than not" Ornelas-Chavez would suffer this fate. Harassment and arbitrary detentions by police officers, to the extent they occur, do not constitute torture. More generally, the evidence does not rise to the level that has compelled us to grant a petition for review in prior cases. There is no record evidence alleging that "torture [is] routinely administered" to

---

[11]Record evidence included an estimate that between eight and twelve percent of the Mexican population of 105 million persons is homosexual in orientation. *See* U.S. Department of State Homepage, Background Note: Mexico, *at* http://www.state.gov/r/pa/ei/bgn/35749.htm (last visited June 28, 2006) (providing statistics as to total population).

The record, of course, also includes an observation that the number of homosexuality-related homicides (1) mirrors the homicide rate for the Mexican population generally, and (2) has been in sharp decline since the early 1990s.

any group in Mexico, *see Al-Saher*, 268 F.3d at 1147; nor is there evidence that torture is "an institution," or otherwise so pervasive against homosexuals that we must conclude more likely than not Ornelas-Chavez would fall prey to it, *see Khup v. Ashcroft*, 376 F.3d 898, 907 (9th Cir. 2004).

I would affirm the determination that Ornelas-Chavez failed to meet his burden of showing that he was more likely than not to be tortured, as specifically defined by the regulations, if returned to Mexico.

### III

For all of the foregoing reasons, I respectfully dissent.