**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

RAFAEL LAZARO LOPEZ ALMARAZ,
*Petitioner,*

v.

ERIC H. HOLDER JR., Attorney
General,
*Respondent.*

No. 08-74497

Agency No.
A095-399-779

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted June 11, 2010 *
Portland, Oregon

Filed June 22, 2010

Before: David R. Thompson and M. Margaret McKeown,
Circuit Judges, and Robert J. Timlin,
Senior District Judge.**

Opinion by Judge McKeown

---

*The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

**The Honorable Robert J. Timlin, United States District Judge for the Central District of California, sitting by designation.

## COUNSEL

Rosaura Rodriguez, Seattle, Washington, for the petitioner.

Ilissa M. Gould, Washington, DC, United States Department of Justice, Office of Immigration Litigation/Civil Division for the respondent.

## OPINION

McKEOWN, Circuit Judge:

Rafael Lazaro Lopez Almaraz ("Lopez") petitions for review of the Board of Immigration Appeals's ("BIA") denial of his motion to reopen and remand. He also raises an issue of first impression—whether adoption of an international trade agreement amounts to changed country conditions that resurrect his late-filed motion. We are not persuaded by this novel argument. We deny the petition.

### BACKGROUND

Lopez, a native and citizen of Guatemala, entered the United States in 1999. In 2004, he was charged with removability by the Department of Homeland Security as an alien present in the United States without being admitted or paroled. 8 U.S.C. § 1182(a)(6)(A)(i). At his hearing, Lopez admitted the allegations against him and conceded removability. However, he argued that he was eligible for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"), on the basis of an event that occurred in 1984.

Lopez testified that ten armed men attacked him and his family in his home in Guatemala when he was fourteen years old. They beat Lopez and one of his sisters and searched his house for weapons. The men also questioned his family about their involvement with guerrillas. When the men left, they took Lopez's parents with them and he never saw them again. He later learned that his uncle had also been attacked and kidnaped the same night. After the incident he moved from his village to Guatemala City.

The Immigration Judge ("IJ") found that Lopez was not eligible for asylum because his application was not filed within one year of his arrival in the United States and he had not

established that there were exceptional circumstances sufficient to overcome this time bar. 8 C.F.R. § 1208.4(a)(5). Because Lopez had lived safely in Guatemala City for thirteen years after the incident, and the civil conflict in Guatemala had been resolved, the IJ denied his withholding of removal and CAT claims as well. Lopez was granted voluntary departure.

Lopez's appeal to the BIA was dismissed in 2005. He did not seek review in this court. Almost three years later, however, he filed a motion to reopen based on new evidence. His motion explained that he was diagnosed with HIV and was "afraid to return to Guatemala because of widespread violence against [people] living with HIV and the fact that if he [were] forced to return he would not have [proper] access to medicine." The BIA denied the motion in October 2008.

## ANALYSIS

### I. HIV Diagnosis

[1] Lopez's motion to reopen is time-barred because it was not filed within 90-days of the BIA's 2005 decision. 8 U.S.C. § 1229a(c)(7)(C)(i). This time bar does not apply if the relief is "based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous hearing." 8 C.F.R. 1003.2(c)(3)(ii).

[2] The fact that Lopez was diagnosed with HIV, on its own, does not satisfy the requirements of § 1003.2(c)(3)(ii). Lopez was diagnosed with HIV in 2001, several years before his immigration hearing. Lopez argues that he was afraid to mention at the hearing that he had HIV because he thought it would frustrate his efforts to remain in the United States. This belief was grounded, in part, on his view that in Guatemala people with HIV are stigmatized and live in constant fear of

retaliation. Although Lopez's hesitation to reveal his diagnosis is understandable, it does not render old information suddenly new. Evidence of the diagnosis was available to be presented at the hearing, Lopez's failure to do so notwithstanding.

**[3]** Even if the diagnosis qualified as new information because the stigma occasioned a delay in reporting, a change in Lopez's health is a change in his personal circumstances, not a change in circumstances "arising in the country of nationality . . . ." Lopez's argument that a change in personal circumstances might satisfy the requirements to file an untimely asylum application under 8 U.S.C. § 1158(a)(2)(D) is foreclosed by the BIA's decision in *Matter of C-W-L.* The BIA interpreted § 1158(a)(2)(D) to require that a petition for successive asylum applications be filed as "part of a timely and properly filed motion to reopen or one that claims that the late motion is excused because of changed country conditions." 24 I. & N. Dec. 346, 354 (BIA 2007); *see also Chen v. Mukasey*, 524 F.3d 1028, 1032 (9th Cir. 2008) (according *Chevron* deference to BIA's interpretation of §§ 1158(a)(2)(D) and 1229(a)(c)(7) in *Matter of C-W-L*). Thus, even if a change in personal circumstances is sufficient to file a successive asylum petition under § 1158(a)(2)(D), a change in country conditions must still be demonstrated if the accompanying motion to reopen is untimely.

## II. Dominican Republic-Central America-United States Free Trade Agreement

Recognizing the difficulty with the personal circumstances argument, Lopez urges us to consider his HIV positive status in light of the Dominican Republic-Central America-United States Free Trade Agreement ("CAFTA"),[1] which he argues

---

[1]*See* Office of the United States Trade Representative, Free Trade Agreements, http://www.ustr.gov/trade-agreements/free-trade-agreements/cafta-dr-dominican-republic-central-america-fta/final-text (last visited June 15, 2010).

qualifies as a material change in circumstances arising from his country of nationality. In August 2004, the United States signed CAFTA with Costa Rica, El Salvador, Guatemala, Honduras, Nicaragua, and the Dominican Republic. Congress approved and implemented the agreement a year later. 19 U.S.C. §§ 4001 *et seq.* CAFTA was designed to facilitate trade and investment among the parties by, among other things, expanding and securing markets, promoting transparency, and establishing mutually advantageous rules of commerce. *See* CAFTA, Preamble.

**[4]** Although Lopez does not provide any specific citations to CAFTA, we infer from his argument and the documents submitted that he is primarily concerned with Article 15.10, which is entitled "Measures Related to Certain Regulated Products." Section 1(a) provides that:

> If a Party requires, as a condition of approving the marketing of a new pharmaceutical or agricultural chemical product, the submission of undisclosed data concerning safety or efficacy, the Party shall not permit third persons, without the consent of the person who provided the information, to market a product on the basis of (1) the information, or (2) the approval granted to the person who submitted the information for at least five years for pharmaceutical products . . . from the date of approval in the Party.

In other words, a party to CAFTA may restrict third party access to confidential data "concerning safety or efficacy." The result of this "data exclusivity," Lopez argues, is that the development and availability of generic medicines for HIV/AIDS will be significantly delayed. Lopez contends that the price of brand name versions of such medicines, if they are even available in Guatemala, will be exorbitantly high and he will be unable to afford treatment if he is removed to Guatemala. He points specifically to the availability of the drug

Atazanavir, "a key part of second line therapy for people with HIV/AIDS."

**[5]** Without doubt CAFTA and other international trade agreements affect the lives of the citizens of signatory countries in numerous ways. We do not discount the possibility that such an undertaking, even if primarily economic in nature, could potentially qualify as a material change in country conditions sufficient to grant a motion to reopen. But we need not address that issue here as the BIA determined that Lopez failed to establish that the passage of CAFTA was material to his claim. The documents Lopez submitted—even if accepted as true—were inconclusive. While they support, to some extent, his claim about "data exclusivity" and the high price of Atazanavir, they also reveal that Atazanavir would enter the generic market in Guatemala by 2009, and that "[a]ntiretroviral treatment for AIDS patients is free in Guatemala."

We also note that CAFTA expressly contemplates the tension between the protection of intellectual property rights and the availability of life saving medicines. An Understanding to the agreement provides that:

> The Governments of the [Parties to CAFTA] have reached the following understandings regarding Chapter Fifteen (Intellectual Property Rights) of [CAFTA]:
>
> The obligations of Chapter Fifteen do not affect a Party's ability to take necessary measures to protect public health by promoting access to medicines for all, in particular concerning cases such as HIV/AIDS, tuberculosis, malaria, and other epidemics as well as circumstances of extreme urgency or national emergency.
>
> In recognition of the commitment to access to medicines that are supplied in accordance with the Deci-

sion of the General Council of 30 August 2003 on the Implementation of Paragraph Six of the Doha Declaration on the TRIPS Agreement and public health (WT/L/540) and the WTO General Council Chairman's statement accompanying the Decision (JOB(03)/177, WT/GC/M/82) (collectively the "TRIPS/health solution"), Chapter Fifteen does not prevent the effective utilization of the TRIPS/health solution.

CAFTA, IP Understanding on Public Health.

**[6]** Finally, there is no support in the record for the claim that the enactment of CAFTA is a form of governmental persecution against people with HIV/AIDS. CAFTA is a complicated, international agreement designed to promote investment and trade. The specific intellectual property provisions at issue, at least according to several of the documents Lopez submitted, were included because of pressure from the pharmaceutical industry in the United States, not because the Guatemalan government wanted to persecute people with HIV/AIDS. We make no judgment on the merits of the competing arguments about the genesis or effect of the intellectual property provisions other than to note that Lopez's evidence does not compel the conclusion he advanced. In short, Lopez has not established changed circumstances based on material evidence that was previously unavailable.

**[7]** The BIA's determination that Lopez's arguments were speculative and unsupported by evidence in the record was neither arbitrary, irrational, nor contrary to law. The BIA did not abuse its discretion by denying Lopez's untimely motion to reopen. *Azanor v. Ashcroft*, 364 F.3d 1013, 1018 (9th Cir. 2004) ("An abuse of discretion will be found when the denial was arbitrary, irrational or contrary to law.") (internal quotation marks and citations omitted).

**PETITION DENIED.**