**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**August 18, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

FORTINO CHAVARIN-PARRA,

Petitioner,

v.

MERRICK B. GARLAND, United States
Attorney General,

Respondent.

No. 21-9563
(Petition for Review)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, Chief Judge, **MATHESON**, and **EID**, Circuit Judges.
_____

Fortino Chavarin-Parra, a native and citizen of Mexico, petitions for review of

the Board of Immigration Appeals' ("BIA") dismissal of his appeal from the

immigration judge's ("IJ") denial of his claim for deferral of removal under the

Convention Against Torture ("CAT").  He also appeals the BIA's decision affirming

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel.  It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

the IJ's denial of his motion to continue the merits hearing pending adjudication of his application for a U-visa.  Exercising jurisdiction under 8 U.S.C. § 1252(a)(4), we deny the petition.

## I.  BACKGROUND

### A. *Prehearing Background*

Mr. Chavarin-Parra arrived in the United States in 1999 when he was a child. In 2017, he was charged regarding a marijuana-growing operation on federal land. The Department of Homeland Security ("DHS") learned that he was in the country illegally and placed him in removal proceedings.  In 2018, he pled guilty to conspiracy to manufacture marijuana and depredation of public land and was sentenced to 46 months in prison.  *See* 21 U.S.C. §§ 841(a)(1), 846; 18 U.S.C. § 1361.  While in prison, he applied for a U-visa with the United States Citizenship and Immigration Services.[1]  Following his release, DHS detained Mr. Chavarin-Parra and lodged additional charges of removability based on his criminal convictions.

---

[1] A noncitizen who is a victim of certain crimes while in the United States may petition for U nonimmigrant status—more commonly known as a U-visa.  8 U.S.C. § 1101(a)(15)(U).  A U-visa generally entitles an eligible noncitizen to lawfully remain in the United States and to seek work authorization.  *See id.* § 1184(p)(6).  To qualify, a noncitizen must demonstrate that (1) while in the United States, he suffered substantial physical or mental abuse from being a victim of certain criminal activity; (2) he has information about the criminal activity; and (3) a law enforcement official has certified that he has been, is being, or is likely to be helpful in the investigation or prosecution of the criminal activity.  *See id.* § 1101(a)(15)(U)(i).

## B. *Motion to Continue Removal Proceedings*

Shortly before the merits hearing, Mr. Chavarin-Parra filed a motion to continue the proceedings pending adjudication of his U-visa, arguing there was good cause for a continuance based on his prima facie eligibility for a U-visa.  The IJ denied the motion.

> I don't think there's good cause for a continuance[] because he's detained . . . with . . . an aggravated felony, with a drug trafficking crime.  And, . . . he's unlikely to get out of custody because of . . . that.  And so . . . if a U visa takes—you know, even if they're expediting it, it still takes forever to do. . . . I'm not going to leave him detained here for three to five years, with his case pending.

Admin. R., Vol. 1 at 164.

## C. *Mr. Chavarin-Parra's Testimony*

At the merits hearing in early 2021, Mr. Chavarin-Parra testified he would more likely than not be tortured upon his removal to Mexico because:

(1) as an outsider he was vulnerable to threats of violence and torture;

(2) he would be kidnapped and held for ransom because he had relatives living in the United States;

(3) his criminal history made him a target for torture by the police or recruitment by the cartels; and

(4) he faced reprisal from the cartels based on his kinship ties to current or former cartel members.

Mr. Chavarin-Parra said he could be identified in Mexico as an outsider because he speaks Spanish with an English accent and has the mannerisms and behavior of an American.  He also feared kidnapping because his relatives in the

3

United States could afford to pay a ransom.  "I will be coming from . . . the U.S. . . . People will find out that I have family here in the U.S.  I can be kidnapped for ransom, . . . and I can be tortured, forcibly disappeared, or killed."  *Id.* at 211.  And as someone with a criminal background, the cartels would perceive him as an easy target for recruitment, and "when you deny recruitment, . . . you can be tortured, forcibly disappeared or killed."  *Id.* at 210.  Alternatively, "corrupted police officers" would "torture [him]" to obtain information under the mistaken belief that he was "a cartel member or . . . part of some [criminal] organization."  *Id.*

Regarding his kinship ties, Mr. Chavarin-Parra testified that his father told him that several of his uncles were murdered in Mexico.  His father said Victor and Alvaro were murdered in 2011; Ernesto was kidnapped in 2011, and his body parts were found in 2012; Ermos was kidnapped in 2012, and presumed dead; and Sexto was murdered in 2018, following his removal from the United States to Mexico.  Ermos lived in Puerto Vallarta and worked at a hotel.  The other four were alleged cartel members who lived in in the State of Jalisco.  Mr. Chavarin-Parra had never met any of his uncles other than Sexto.

According to Mr. Chavarin-Parra, his uncles were murdered "because . . . [they had] family members who were former, and are current, cartel members."  *Id.* at 204.  He did not know which cartel his family was affiliated with, who killed his uncles, or why they were killed.  He also did not know how many family members still belong to the cartel or "who they are."  *Id.* at 207.  Relatedly, he denied that

4

either he or anyone in his immediate family had ever been the member of a cartel or any other criminal group.

Mr. Chavarin-Parra conceded that (1) he had never been harmed or threatened by anyone in Mexico; (2) he had never had any interaction with the police or any government officials; and (3) he had no evidence to show that he specifically would be targeted by corrupt police officers or cartel members. *See id.* at 221-22.

### D. *Expert Testimony*

Richard Kirkland, Ph.D., testified as Mr. Chavarin-Parra's expert on security issues and country conditions in Mexico. He provided general information about drug cartels, including their goals and operations. Broadly speaking, he explained that "the main thing that they want is . . . to be left alone . . . [so they can] transport drugs to the United States." *Id.* at 256. To keep their operations running smoothly, "[t]he cartels will . . . often . . . intimidate local police and local politicians in order to force them to . . . [turn] a blind eye [to their] activities." *Id.* He cited low pay as the primary reason why police are vulnerable to bribes. Also, the cartels have informants within the government and police who keep them "up to date on . . . what's going on . . . so that they're . . . aware of the situation in . . . their area of operation. *Id.* at 257.

Dr. Kirkland also explained that "people who haven't lived in Mexico for a long period of time . . . or that have lived in the United States for a long period of time" are known as "pocho[s]." *Id.* at 260. With little or no background in Mexican

5

culture, these outsiders are often "shunned" and not "able to hold down a job." *Id.*
He did not, however, say anything about outsiders having a heightened risk of torture
or violence.

As to extortion, Dr. Kirkland said that "returnees are targeted[] because [their
relatives in the United States] may have money [to] pay the extortion." *Id.* at 263.
He added that the "easiest person [for the cartels] to recruit . . . is somebody with no
ties . . . to the local area. That's why you see recruitment of returnees." *Id.* at 260.
He acknowledged, however, that the cartels also recruit from the general population.
*See id.* at 262. And although returnees might be targets for extortion or recruitment,
Dr. Kirkland never mentioned torture or violence as a consequence of non-
compliance. *See id.* at 261, 263.

Addressing torture in general, Dr. Kirkland noted that the police have
sometimes "resorted to torture . . . in order to . . . extract information from . . .
detainees, in order to be able to find out the operations of . . . cartels, or . . . what is
. . . going on with these criminal organizations." *Id.* 258. "And . . . [the police] . . .
have done . . . violence [at the] behest of the cartels, but those would be police that
would be . . . corrupt, and ones that aren't operating under Mexican law." *Id.*

Dr. Kirkland acknowledged that the Mexican government began to crack down
on the drug cartels more than twenty years ago, noting several specific steps taken to
eradicate police corruption and cartel violence. He also credited local governments
for "working as best as they can." *Id.* at 255. According to Dr. Kirkland, rural areas

6

near the border in the southern part of Mexico are relatively safe from the influence and criminal activities of the cartels.

### E. *Agency Decisions*

1. **Immigration Judge**

The IJ found that Mr. Chavarin-Parra and Dr. Kirkland were credible witnesses. But after "consider[ing] all of the evidence in the record, and all evidence relevant to the possibility that [he] would experience torture in the future," *id.* at 104, the IJ denied CAT deferral. The IJ said Mr. Chavarin-Parra failed to show it is more likely than not that he would be subject to torture with the consent or acquiescence of the Mexican government.[2] As to the likelihood of torture, the IJ found "nothing beyond [a] generalized threat of violence in Mexico that would cause [him] to be harmed should he be returned to Mexico." *Id.* at 105. "Indeed, the Court does not see any type of specific threat . . . that is any different from anyone else who has been a long-time resident of the United States and is returning to Mexico." *Id.* at 104. Additionally, the IJ found: (1) no evidence of past torture; (2) torture by the police is directed primarily against cartel members; (3) no details surrounding his

---

[2] The IJ also found that due to the nature of his criminal convictions, Mr. Chavarin-Parra was ineligible for asylum, withholding of removal, or withholding of removal under the CAT. He did not challenge the pretermission of these claims on appeal, and the BIA deemed the issues waived.

uncles' murders to support a threat of torture or violence based on kinship ties; and

(4) there were places in Mexico where he could safely relocate.

Moreover, the IJ found that "it is even less likely that [Mr. Chavarin-Parra]

would be tortured . . . with the acquiescence of a government official, or with a

government official turning a blind eye to the torture." *Id.* at 105.

2. **BIA**

In affirming the IJ's denial of CAT deferral, the BIA agreed with the IJ that

Mr. Chavarin-Parra failed to meet his burden.  It stressed that the IJ's findings were

based on the totality of the evidence, noting that the IJ specifically "acknowledged

[Mr. Chavarin-Parra's] criminal conviction . . . [and also] found it speculative that

[his] likelihood of torture by cartels would be increased based on his family relation."

*Id.* at 5.  The BIA further rejected the argument that the IJ failed to "specifically

address whether he faces a likelihood of being kidnapped and tortured in Mexico."

*Id.*  To the contrary, the BIA noted that the IJ considered the likelihood of torture for

any reason.

> The [IJ] stated that torture is a concern in Mexico, but the
> record did not support a specific threat of torture to [him]
> based on his kinship ties *or based on any other reason*. . . .
> We are not persuaded that the [IJ] overlooked any evidence of
> a specific threat . . . or of a heightened threat to [Mr.
> Chavarin-Parra] *based on his personal characteristics or his
> probable future situation in Mexico*.

*Id.* (quotation omitted) (emphasis added).

> In sum, while [Mr. Chavarin-Parra] may be at some
> risk of recruitment or harm by cartels, or other forms of

8

> violence in Mexico, he was not tortured in the past and has not established more than a speculative possibility—as opposed to a likelihood—that he will be tortured in Mexico in the future.

*Id.* at 6.

The BIA also noted Mr. Chavarin-Parra's failure to identify specific evidence showing government acquiescence to torture. Instead, he "only cite[d] to generalized evidence . . . regarding the lack of response of the government to torture in Mexico." *Id.* at 5. The BIA said that "generalized evidence of the Mexican government's struggles to respond to widespread violence is not sufficient to establish acquiescence," *id.* at 5-6 (citing *Ferry v. Gonzales*, 457 F.3d 1117, 1131 (10th Cir. 2006)).

The BIA finally rejected Mr. Chavarin-Parra's argument that the IJ improperly denied his motion for a continuance. It determined that the IJ's findings regarding the "the probable time frame under which . . . [the] request for adjudication . . . might take" and his detained status were sufficient grounds to deny the motion under the agency's precedents. *Id.* at 6.

## II.  DISCUSSION

Where, as here, a single member of the BIA issued an order affirming the IJ's decision, we review "both the decision of the BIA and any parts of the IJ's decision relied on by the BIA in reaching its conclusion." *Razkane v. Holder*, 562 F.3d 1283, 1287 (10th Cir. 2009); *see also Uanreroro v. Gonzales*, 443 F.3d 1197, 1204

9

(10th Cir. 2006) (explaining that when the BIA's decision provides "a condensed version" of the IJ's reasons for the decision, we may consult "the IJ's more complete discussion" to "give substance to the BIA's reasoning").

## A. *CAT Deferral*

### 1. **Jurisdiction and Standard of Review**

The jurisdictional bar to reviewing factual challenges to final orders of removal in 8 U.S.C. § 1252(a)(2)(C) does not preclude judicial review of a noncitizen's factual challenges to an order denying CAT protection. *See Nasrallah v. Barr*, 140 S. Ct. 1683, 1690-91 (2020). Mr. Chavarin-Parra brings factual challenges here.

Our review of the agency's factual findings is highly deferential. *See id.* at 1692 ("Although a noncitizen may obtain judicial review of factual challenges to CAT orders, that review is highly deferential."). We must affirm the agency's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Yuk v. Ashcroft*, 355 F.3d 1222, 1233 (10th Cir. 2004) (quotation omitted). Under this substantial-evidence standard, the agency's "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). "[E]ven if we disagree with the BIA's [findings], we will not reverse if they are supported by substantial evidence and are substantially reasonable." *Htun v. Lynch*, 818 F.3d 1111, 1119 (10th Cir. 2016) (brackets and quotation omitted); *see also Vladimirov v.*

10

*Lynch*, 805 F.3d 955, 960 (10th Cir. 2015) (explaining that when evaluating whether substantial evidence supports an agency's judgment, we do not "reweigh the evidence").

2. **Legal Background**

A noncitizen like Mr. Chavarin-Parra who is ineligible for asylum or withholding of removal under either the Immigration and Nationality Act or the CAT remains eligible for CAT deferral. 8 C.F.R. §§ 1208.16(c)(4), 1208.17(a). To establish such a claim, the noncitizen must first prove "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Id.* § 1208.16(c)(2). "Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person." *Id.* § 1208.18(a)(1).

To meet this burden, the noncitizen must demonstrate a personal risk of torture. *See In re J-E-*, 23 I. & N. Dec. 291, 303 (B.I.A. 2002) (en banc) ("The United Nations Committee Against Torture has consistently held that the existence of a consistent pattern of gross, flagrant, or mass violations of human rights in a particular country does not, as such, constitute sufficient grounds for determining that a particular person would be in danger of being subjected to torture upon his return to that country." Instead, "[s]pecific grounds must exist that indicate the individual would be personally at risk." (footnote omitted)), *overruled on other grounds by Azanor v. Ashcroft*, 364 F.3d 1013 (9th Cir. 2004). *See also Escobar-Hernandez v.*

11

*Barr*, 940 F.3d 1358, 1362 (10th Cir. 2019) (noting that "by itself, pervasive violence in an applicant's country generally is insufficient to demonstrate the applicant is more likely than not to be tortured upon returning there").

In assessing the likelihood of torture, the factfinder must consider "all evidence relevant to the possibility of future torture . . . including, but not limited to . . . [e]vidence of past torture"; the applicant's ability to relocate "to a part of the country of removal where he or she is not likely to be tortured"; "[e]vidence of gross, flagrant or mass violations of human rights within the country of removal"; and "[o]ther relevant information regarding conditions in the country of removal." *Id.* § 1208.16(c)(3)(i)-(iv).

The second requirement of a CAT deferral claim is consent or acquiescence of the government. For "severe pain or suffering" to warrant deferral of removal under the CAT, it must be "inflicted by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). "Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." *Id.* § 1208.18(a)(7). "This standard does not require actual knowledge, or willful acceptance by the government. Rather, willful blindness suffices to prove acquiescence." *Karki v. Holder*, 715 F.3d 792, 806 (10th Cir. 2013) (citation and quotation omitted). Evidence of police corruption or

12

inability to prevent torture does not compel a finding of acquiescence. *See, e.g.,*

*Ferry*, 457 F.3d at 1131 (petitioner failed to show acquiescence where the record

showed the government had made efforts to prevent potential torture); *see also Cruz-*

*Funez v. Gonzales*, 406 F.3d 1187, 1192 (10th Cir. 2005) (evidence of government

corruption and underfunding of police did not compel a conclusion of government

acquiescence).

3.  **Analysis**

According to Mr. Chavarin-Parra, substantial evidence does not support the

agency's finding that he would not likely be tortured.  We disagree.  Mr. Chavarin-

Parra fails to overcome the highly deferential substantial-evidence standard, which

provides that the agency's factual findings are conclusive unless any reasonable

adjudicator would be compelled to conclude to the contrary.  *See Nasrallah*, 140 S.

Ct. at 1692; *see also* 8 U.S.C. § 1252(b)(4)(B).[3]

---

[3] Mr. Chavarin-Parra fails to address the agency's finding that the Mexican government would not acquiesce in torture.  But even if he had presented an adequate argument, the record supports the agency's finding.  Although Dr. Kirkland testified there are problems with police corruption, he acknowledged that the Mexican government began to crack down on the drug cartels more than 20 years ago.  He described several specific steps taken to combat cartel violence.  As the BIA noted, and Mr. Chavarin-Parra never disputes, "generalized evidence of the Mexican's government's struggles to respond to widespread violence is not sufficient to establish acquiescence."  Admin. R., Vol. 1 at 5-6.  The agency's finding that the Mexican government would not acquiesce to torture is supported by substantial evidence.  *See Karki*, 715 F.3d at 806 (quotation omitted).  *See also Ferry*, 457 F.3d at 1131; *Cruz-Funez*, 406 F.3d at 1192.

First, Mr. Chavarin-Parra argues that "the IJ failed to make a factual finding on whether [he] would more likely than not be tortured if he returned to Mexico because he has a criminal record." Pet'r's Opening Br. at 19. He is mistaken. The IJ specifically mentioned "his criminal record [and] that he may be targeted for recruitment[,] [a]nd if he resists . . . he could be harmed by cartels." Admin. R., Vol. 1 at 97. But after "consider[ing] all of the evidence in the record, and all evidence relevant to the possibility that [he] would experience torture in the future," the IJ did "not see a specific threat . . . based . . . *on any reason*." *Id.* at 104 (emphasis added).

The BIA also reviewed the issue and determined that the IJ did not overlook this matter. "Contrary to [Mr. Chavarin-Parra's] arguments, the [IJ] discussed the specific facts that might increase the likelihood of torture. . . . While the [IJ] may not have specifically mentioned each and every factor, the [IJ] stated that all evidence had been considered." *Id.* at 4-5 (citation omitted)." Moreover, "[i]t is clear from the [IJ's] detailed recounting of the evidence that the [IJ] did not disregard evidence." Thus, the BIA was "not persuaded that the [IJ's] findings of fact are not based on the totality of the evidence." *Id.* at 5.

Second, Mr. Chavarin-Parra maintains that the IJ ignored the evidence concerning his kinship ties to cartel members and how those ties would lead to him being tortured or killed. But he conceded that he did not know who murdered his uncles or why they were murdered. Nor did he know which cartel they belonged to or any other details of their lives, having never met any of them other than Sexto.

14

Thus, substantial evidence supports the IJ's finding that there was no likely threat of torture. As the IJ explained, "the motivation behind these killings, the reasons, who did it, those types of details are completely lacking from [Mr. Chavarin-Parra's] evidence. As a result, the Court does not see a specific threat [of torture] . . . based on his kinship ties or based on any other reason." *Id.* at 104.

Also, Mr. Chavarin-Parra overstates the record when he says that he "produced evidence *from an expert witness and an expert report* showing a strong likelihood of being tortured if returned to Mexico due to his connections to family members who were cartel members." Pet'r's Opening Br. at 21-22 (emphasis added). There is no such expert evidence. Instead, the evidence he cites is his own testimony.

Third, Mr. Chavarin-Parra argues that the IJ overlooked evidence that he would likely be tortured as a returning deportee from the United States. He says that he "provided testimony and evidence that he would be targeted [for torture] . . . as a returning deportee." *Id.* at 24 (quotation omitted). But Dr. Kirkland testified only that returning deportees are sometimes shunned and have a hard time finding employment, adding that those who lack ties to the community may be targeted for recruitment by the cartels. He said nothing about torture or violence. And although Dr. Kirkland mentioned that returning deportees who have relatives in the United States might be at a greater risk for kidnapping, Mr. Chavarin-Parra presented no evidence that he was at greater risk than other returning deportees in the same circumstances. Substantial evidence supports the IJs finding that there was no "type

15

of specific threat to [Mr. Chavarin-Parra] that is any different from anyone else who has been a long-time resident of the United States and is returning to Mexico." Admin. R., Vol. 1 at 104.

## B. *Motion to Continue*

### 1. **Jurisdiction and Standard of Review**

Because Mr. Chavarin-Parra was convicted of a conspiracy involving a controlled substance, our jurisdiction is limited. Under 8 U.S.C. § 1252(a)(2)(C), "No court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section 1182(a)(2)." But we may review the removal to the extent that the noncitizen raises a constitutional claim or question of law. *See id.* § 1252(a)(2)(D) ("Nothing in subparagraph . . . (C), . . . which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review."). A noncitizen "does not present a [legal] claim capable of avoiding the jurisdictional bar by arguing that the evidence was incorrectly weighed, insufficiently considered, or supports a different outcome." *Kechkar v. Gonzales*, 500 F.3d 1080, 1084 (10th Cir. 2007).

"[T]he application of law to undisputed or established facts is a question of law within the meaning of § 1252(a)(2)(D)." *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1069 (2020) (brackets and quotation omitted). Thus, we retain jurisdiction to consider Mr. Chavarin-Parra's challenge to the denial of his motion for a continuance

insofar as it concerns whether the agency properly applied its precedent to undisputed or established facts. Our review of this legal question is de novo. *See Mena-Flores v. Holder*, 776 F.3d 1152, 1162 (10th Cir. 2015).

2. **Legal Background**

"An [IJ] may grant a motion for continuance only 'for good cause shown,' within [the judge's] sound discretion." *In re Villarreal-Zuniga*, 23 I. & N. Dec. 886, 891 (B.I.A. 2006) (quoting 8 C.F.R. § 1003.29). The party seeking a continuance bears the burden of showing good cause. *Matter of L-A-B-R-*, 27 I. & N. Dec. 405, 413 (A.G. 2018).

In *Matter of Sanchez Sosa*, 25 I. & N. Dec. 807, 812-13 (B.I.A. 2012), the BIA explained that in assessing whether there is "good cause" to grant a continuance pending the adjudication of a U-visa application, the IJ should consider several factors, including: "(1) the DHS's response to the motion; (2) whether the underlying visa petition is prima facie approvable; and (3) the reason for the continuance and other procedural factors."

The Attorney General refined the *Sanchez Sosa* analytical framework in *Matter of L-A-B-R-*, to provide that the agency should consider and balance "all relevant factors" in assessing whether there is "good cause" to continue proceedings to accommodate a collateral matter such as a visa petition. 27 I. & N. Dec. at 413. The primary factors to be considered are: "the likelihood that the alien will receive the pursued collateral relief," and whether that "relief will materially affect the outcome

17

of the removal proceedings." *Id.* at 415. There are also "secondary factors" that should be considered, which include, "the [alien's] diligence in seeking collateral relief, DHS's position on the motion for continuance, and concerns of administrative efficiency." *Id.* "It may also be appropriate to consider the length of the continuance requested, the number of hearings held and continuances granted previously, and the timing of the continuance motion." *Id.*

But *L-A-B-R-* was not the agency's final word on the issue. In *Matter of L-N-Y-*, 27 I. & N. Dec. 755, 758 (B.I.A. 2020), the BIA explained that the "primary factors [such as prima facie eligibility for a U-visa] *are not dispositive*" "especially . . . where . . . there are relevant secondary factors that weigh against continuing the proceedings—in particular, . . . concerns regarding administrative efficiency, which include the uncertainty as to when a visa will be approved or become available and the [alien's] detained status." (emphasis added). Specifically, IJs should hesitate in granting indeterminate continuances for detained aliens because "[g]ranting an indeterminate continuance greatly impacts administrative efficiency in a typical case, but particularly where . . . the alien is detained." *Id.* at 759.

3. **Analysis**

Mr. Chavarin-Parra maintains that the IJ failed to follow agency precedent in ruling on his motion for a continuance. We disagree. The IJ considered the relevant secondary factors discussed in *Matter of L-N-Y-,* including the uncertainty as to when

a U-visa might be granted and Mr. Chavarin-Parra's detained status.  There was no legal error.

Nor was the IJ required to discuss every factor, including whether Mr. Chavarin-Parra was prima facie eligible for a U-visa.  All that is required is for the IJ "to announce [his] decision in terms sufficient to enable a reviewing court to perceive that [he] has heard and thought and not merely reacted."  *Mena-Flores*, 776 F.3d at 1171 (quotation omitted).  Here, the IJ considered that the U-visa timeline was indefinite and could take years, and Mr. Chavarin-Parra was detained and unlikely to be released.  This was sufficient for our review.

## III. **CONCLUSION**

We deny the petition for review.

Entered for the Court


Scott M. Matheson, Jr.
Circuit Judge